Have all of you taken the Barbary course? Are you prepared to tell us your scores? Yes, Your Honor. I'm Alan Harris on behalf of the appellants. In reviewing the briefs below and our briefs in this court over the weekend, it occurred to me that there's a little further emphasis. There are about 25,000 students, members of the putative Stetson class, who purchased the Barbary course during a 13-month period between August 1, 2006 and September 10, 2007. Those students derived no benefit from either the financial or injunctive relief offered by the Rodriguez settlement. The Rodriguez settlement addressed a class of students who purchased the Barbary course only through July 31, 2006. However, the settlement was negotiated in 2007 and did not have final approval below in the district court until September 10, 2007. So there's at least a 13-month period of students who are not in the Rodriguez class and who purchased the course before the settlement was approved below. Can I just clarify the status of the Rodriguez settlement? One of the elements of injunctive students. I'm just wondering, since we remanded the Rodriguez case, the Rodriguez settlement, whether Barbary has been in compliance with the injunctive aspects of the settlement agreement since we, you know, affirmed the approval, other than, you know,  I would have to defer that to my colleagues. I don't know if they're currently in compliance with that. It is my impression that they are, but I'd have to ask them to respond to that question. I'm just wondering whether the people in your class purchased the course, the class A who agreement in approach or not. Right. During the first 13-month period, that provision was not in effect. In other words, the soonest time at which the injunctive relief in theory would have been granted and the defendants required to follow that would have been September of 07, leaving a 13-month gap period during which there was no injunctive relief benefiting people who purchased the course between August 1, 06. All right. Now, are you talking about the damages there or that they need non-economic relief? Well, they're both factors. All right. Well, the damages are fairly easy to consider. Whether they receive the non-economic relief or whether there's further non-economic relief they need, maybe we possibly we can't determine on a motion to dismiss. But by the time we get to summary judgment, those facts would be in the record. And it may well turn out that there is no non-economic relief necessary. That is certainly possible, Your Honor. The point I'm trying to emphasize this morning was that there was no injunctive relief at all during the 13-month stub period between August 1, 06 and September 10, 07. But you're not going to get non-monetary relief for that period now? Correct. But that just emphasizes the point that those people are very well entitled to damages. Okay. Well, on the economic relief, that's one question. I was trying to set that aside for the moment and say that on the non-economic relief, when we are informed as to what non-economic relief has already been granted, then there's a question whether you're going to seek further non-economic relief. And that will all become clear, I assume, at summary judgment. Absolutely, Your Honor. And it may well be the case by the time we get to summary judgment that further non-economic relief is not necessary because of actions that have taken place in the market since, principally after the 13-month stub period, since September of 07. And so I would agree with you, Your Honor, that the non-economic relief issues should be addressed after we've had actual discovery on that subject to see, one, whether or not, as Your Honor inquires, the mandate of the court has been followed and the freshman students, for example, are relieved of those burdens, and, two, whether the market has now become competitive and there is no need for further non-economic relief. One minor question, could you just clear up for me? With your class, do you plead the class of starting July 1st or July 31st? The class begins, really the class begins August 1st, 2006. What does it say in the complaint? I believe that's what it says in the complaint, from the date of that, and it would also theoretically perhaps include those who had opted out, but that's really not relevant. I thought it was July 1st in the complaint. Well, that may be a mistake. It is July 1st in the complaint. I'm sorry. That's a mistake. The complaint's – Have you asked to amend that, the complaint, in that respect? No, Your Honor. We certainly will do that, because the complaint, the Rodriguez period, covered through July 31st, 2006, and so the Stetson class should begin on August 1st, 2006. All right. So I guess what – okay. So are you basically conceding that the claims are the same in the Rodriguez cases and the Stetson case? Yes, Your Honor. In the complaint, the Rodriguez complaint and the Stetson complaint are virtually identical. In fact, admitted at the defense, at the account of police brief at page 10. And the point is that the illegal co-marketing agreement, for example, as is – The alleged illegal co-marketing agreement. The alleged illegal – and for purposes of the motion to dismiss, I think there's no question that it exists. According to the defense, part of the settlement agreement was that they would withdraw from that co-marketing agreement, and that settlement agreement was negotiated in 07 and approved by the court in September of 07, 13 months after the beginning of the Stetson class period. Right. But I don't understand, since the claims are the same, why didn't you just seek modification of the class for purposes of the settlement in the Rodriguez case? Well, I did not represent the class in the Rodriguez case. But if that settlement is still not final and not been approved, why couldn't someone go into that class and get the benefit of that settlement for the people in the classes you – well, certainly in the class A that you have here? Yes. Well, that's a good suggestion, Your Honor, and perhaps at the close of the day you'll be sending us to mediation like you did along with the last panel. But that very well could be a good – and is a good suggestion. But of course, Mr. Stetson, who had paid for the course, Mr. Fahey, who paid for the course after August 1st, 06, and Mr. Levine, who paid for the course after that paid, either had the alternative possibility of moving to intervene in the Rodriguez case and asking for the settlement to be changed or filing their own case with respect to their own claim in this stub period. And so I think they clearly have the right to go ahead with the stub period. And that raises an interesting point. One asks why was the class cut off on July 31st, 06? And I think that's because this case is unlike most class actions. Here the court certified a contested class certification motion. There was a contested motion for certification and it was granted. And that covered only the period through mid-2006. So the counsel in the former case – and again, I was not part of that – but the counsel in the Rodriguez case were faced with a certified class ending in mid-2006, and they fashioned their settlement class into the same time period. They added a couple months on to the certification period. So it went – but it only went through July 31st. Normally when we settle class actions, the class goes through at least the date of preliminary approval. In this case, that was March of 07. For some reason that is not in the record and that I'm not personally familiar with, I assume it's because they had the momentum going from the certified class that cut it off in mid-06. They did not bring the class forward to July – or September, rather of 2007. Now, under the Palmer decision in the United States Supreme Court, ironically enough, dealing with predecessors of the defendant, Barbary Companies in Georgia, in that decision the court said, after you break up an agreement that's almost identical to the co-marketing agreement here, you're going to have residual effects that impact the pricing and cause injury. So we're not here to say that this class should be limited to the 13-month period, that the Stetson-Carrick class should be limited to that period. And we should be able to develop the facts below, with the economic testimony, to show whether or not the injury continued after the district court approves the Rodriguez settlement. But clearly – Well, what about the class B? Your class B is those who haven't paid but will when they graduate. We don't know who's in that class, but presumably, if they haven't yet paid, then they haven't been subject to the barriers to entry and the harms. So would that class – does that class survive? Well, that should be a matter of discovery and argument in the district court. We should be – now, ironically enough, time has passed, and all of those people have now – everyone in the complaint, all the class representatives are now lawyers, I think. But the point is – Bring in class action. We have good class representatives here. But the point is, it may well be that by the time we go through discovering this case, we may find that there's been sufficient activity in the marketplace so that there's no further need for injunctive relief. That may be the case. But we don't have to decide that on a motion to dismiss, certainly. So the Palmer case obviously leaves open the door for both an award of damages and possibly injunctive relief still. And all of that remains to be seen and is speculative at this point. But the key issue, in my mind, is we at least have a 13-month period of people who have no benefit from Rodriguez, either financially or from any of the injunctive relief. And this case really should be sent back. We will correct the error in the complaint where we said it begins on July 1st. That should be August 1st, 2006. And – but we should go back to the district court where we can develop this factual record or go to the Ninth Circuit mediator and see if we can somehow get relief for the people who were not covered in the Rodriguez settlement. I just have to think that it was because of the unusual circumstance here – it's not that unusual, but it's not the common one – where we have a contested class certification. Then we can infer everybody said, well, let's just stick with that basic group. And that's why they didn't bring it through to bring the class through and up to preliminary approval or final approval as we normally do in class settlements. Obviously, we're – I think Your Honors are all familiar with the allegations in the complaints at paragraphs 48 and 49. Quote, on or about July 31, 1997, Kaplan entered into a so-called co-marketing agreement with Barbary in which Barbary secretly paid to Kaplan up to $750,000 per year, but on the condition that Kaplan secretly agreed to stay out of the full-service bar review course market. Barbary wound down its LSAT preparation course. Part of its agreement with Kaplan was that Barbary would not compete in the LSAT course market against Kaplan. So obviously, we have here a complaint that is neither sparse nor conclusory. The allegations are a detailed outline of blatantly illegal conduct that everyone understands, at least to some degree, was supposed to be changed by the settlement agreement that was negotiated in 2007 and approved in September of 2007. So obviously, it's our conclusion that the decision below should be reversed. And if I could either answer any other questions now or reserve my time. We have no time to reserve. I never have had. But thank you very much. Okay. Thank you. May it please the Court, I'm James Tallon, and I represent the Appley West Publishing Company, and I'm speaking also today for Kaplan insofar as it relates to the Section 1 claim that Judge Real dismissed. Judge Wardlaw, the answer to your question is that Barbary adopted the language in its form for use with first-year law students as required by the Rodriguez settlement, and it's in the record. It's Volume 3, pages 182 and 183. So they adopted it immediately? Yes. When they reached the settlement? So that was when? The settlement was finally achieved in early February 2007. The settlement agreement also provided that Kaplan and Barbary would terminate the co-marketing agreement forthwith, and did. So the point that we make with respect to the effect of the Rodriguez settlement is that the standing of these plaintiffs to seek injunctive relief to break up Barbary and to create a national competitor is in serious question because there is no basis to assume and no facts to plausibly – that have been plausibly alleged in the complaint suggesting that these plaintiffs have a real and immediate danger of being subjected to the sort of conduct they allege in the complaint and the sort of market they allege in the complaint. When this Court affirmed the Rodriguez – that indicated that Barbary was in compliance with the settlement agreement? Yes. In connection with our 12B1 motion, we submitted documents that were exhibits to a declaration, including the form that Barbary uses with first-year law students to sign them up for Barbary courses, and that form includes the language that was required to be included as a result of the Rodriguez settlement. But isn't it a factual question whether, in fact, Barbary implemented the terms of the settlement agreement? I guess I'm having trouble with the fact that this is a motion to dismiss. I understand your standing questions. That's separate. But this is a motion to dismiss. There's certainly plenty of factual allegations. Certainly the same ones that sustained the Rodriguez case through a certified class in the settlement. So I'm not quite in agreement with Judge Rill on the application, Twombly and Iqbal. But I'm just wondering, doesn't this case survive a motion to dismiss because what you're raising is sort of extra-record  No, I would put it the other way around. I was responding to your question, was it in the record? And it was in the record because of our 12B1 motion we were authorized to put in extra complaint facts. But more than that, the complaint doesn't allege a basis to conclude that these plaintiffs were subject to the kind of direct and immediate injury that they are required to fear in order to justify their standing. So that could be decided. There weren't plausible factual allegations other than to say it happened in the past. And that's just not enough. But can I just want to, if that didn't answer your question, I can come back to it. But your reference to Rodriguez is troubling, but perhaps not surprising. You know, it's troubling to me that you get these law students just as they sign up to go to law school. And they are told that they can sign up with Barbary, but they're not committed to take a Barbary course. Well, why do you go bother them to begin with? They don't have enough trouble? Because we want to sign them up. That's good business. There's nothing wrong with wanting to sign up first-year law students. We also, Barbary gives them materials. The papers are raw. They're starting school. They're buying their Black's Law Dictionary. They're Williston on contract. They're not buying Williston anymore. It was Corbin anyway. Corbin. No, Williston. In any event, I don't want the Court to forget that Rodriguez was the ---- I don't know how I ever got through law school without you. Well. I didn't have you when I took the bar. I used my law school notes. It's helpful to have the materials that Barbary gives to first-year law students. I don't know. I look at it, and they scare me. It's not your work. It's not the students' work. It's somebody else's work. The point, though, about Rodriguez is that it was a pre-Trombley complaint, so there was no basis to dismiss it. Over vigorous opposition, Judge Rios ---- Judge Rios dismissed it to me. No. Didn't you move for summary judgment? Judge Rios did deny Kaplan's motion for summary judgment. Okay. But you cannot assume that that's ---- Judges deny partial summary judgment motions for all kinds of reasons. You don't have the briefs here. Especially Judge Rios. You don't have the briefs, you don't have the arguments, and you don't have his oral ruling. Well, I did. I was on the Rodriguez panel. I recall. I was here. Yeah. So I do know about that case. Yes. But you can't conclude that because of that ruling that it's implied that the complaint would have withstood Trombley challenge if Trombley had existed then as a basis to challenge the complaint. What have you got here in terms of facts? Well, did the Supreme Court in Iqbal and Trombley impose a requirement that Congress didn't impose when it set forth the rules for notice pleading? Specifically not. Well, they said it existed. It's always been that there has to be plausible sufficiency. Yes. Okay. So that rule applied to the Rodriguez complaint. It certainly did. And in the pre-Trombley and pre-Iqbal, I would say motions to dismiss antitrust complaints on that basis were few and far between. But if you look at ---- it's this complaint that has to be justified based on what's in it. Not based on what happened in another case. So if you look at this complaint, what have you got really? You've got a series of allegations about Barbary conduct dating back to, as the complaint says, the distant past, whenever that might be. And in all of those instances, you have allegations that the plaintiffs think that Lexis Nexis and Barbary have a market allocation agreement in the United States because Lexis Nexis doesn't do business here. And they hope in discovery to find out about that. That's exactly what Iqbal and Trombley were challenging and criticizing was the hope of opening the door to go through discovery based on allegations such as the one about Lexis Nexis or DeVry or Peeper, which is Barbary is believed to have done something that caused Peeper to withdraw to New York. The assemblage of allegations that are made about Barbary's supposed exclusionary conduct just don't add up to anything. Adding a lot of zeros doesn't yield anything other than zero. Well, you don't think there's an inference that can be drawn from the co-marketing agreement that there was an agreement that maybe they didn't reduce to writing because it would violate the antitrust laws that existed there? Well, that's a ---- That's an inference that comes from this complaint. A competing inference of completely ---- But it's a plausible inference. It's not an implausible inference. All right. But Trombley and Iqbal tell us that if you've got a possible inference and another possible inference, then you don't have a plausible allegation. Right. But I'm saying what if there's a plausible inference to be drawn from that? I can't say that there's a plausible inference because that defeats the argument. What have you got? What have you got in the co-marketing agreement? You have West Bar goes into business. West is acquired by a new owner and quickly jettisons it. West Bar, we know, never got more than 10 percent of the market because the complaint says that Barbary at all relevant times had 90 percent. Then you've got the new owner throwing it out even though West made a gross profit, meaning lost money. Gross profit is not net income. It's West's owner that closes it down. Meanwhile, Kaplan looks at West Bar and doesn't buy it and openly has a co-marketing agreement that the complaint says is for a strategic business purpose having to do with the complementary businesses of Kaplan and Barbary because the complaint says there's no more natural audience to which to market a bar review course than LSAT students. And if I were to try your fact, I might very well buy that argument, but we're at the motion to dismiss. Understood, but what I'm suggesting is that you have in equipoise here a rational, neutral, commercial explanation for the conduct and one which is based on the naked assertion that there was a conspiracy. It doesn't make it more plausible to add the word secret. When all you have is competing inferences, neutral conduct, conspiratorial conduct, Twombly and Iqbal say that's not enough to nudge the allegation, the claim across the line from possible to plausible. And that's what we say with respect to not only the Section 1 claim, but the Section 2 claim. What is the assemblage of allegations with respect to the Section 2 claim monopolization, not conspiracy to monopolize, which was not mentioned in the appellant's brief? What does that say, really? I mean, this Court, Judge Perkerson, participating in the panel in the American professional testing case, concluded that whatever Barbree had done there was no more than sharp-elbowed competition. And that's what this set of allegations is about. All right. Well, I mean, I understand that argument. I think what I'm sympathetic to Barbree on is the argument that, I guess it's the argument that you've settled this case. It's the same case. It's being brought again, and you already settled it, and now you're having to retry it again. And that seems to me to be a more persuasive argument here. Well, it's a troublesome impact, because it's evergreen. I mean, Rodriguez, then Shaw, then Stetson, Judge Reel approved the settlement incorporating the nonmonetary provisions, which this Court reviewed and affirmed. And the impact of that on this class and their standing, the appellants say, is nil, that the market hasn't changed. They fail to acknowledge the provisions of the Rodriguez settlement. They fail to acknowledge the impact of their own allegation that Kaplan acquired PMBR, which, according to their relevant market allegations, competes with Barbree. So there are important market facts which are alleged in the complaint, but there's no plausible factual allegation that says why this group of plaintiffs is at all affected by the conduct or will be affected by the conduct. It is assumed it is not the basis or it is not the subject of a plausible set of factual allegations, which is why the standing argument makes sense to me, that if you want to go after standing to seek an injunction to break up Barbree and have the Court create a national competitor, you've got to do more than saying, all these bad things that Barbree did in the past, well, they're going to happen again. That's not a plausible factual allegation. That's not a basis plausibly to assert standing to achieve that kind of injunctive relief. Judge Reel knew that the lawyers who made these allegations made allegations of a similar sort in the Rodriguez case, and Twombly and Iqbal invite Judge Reel and this Court to use experience and common sense and look at these allegations. And if you string them together on the monopolization claim, you have a series of things which don't amount to more than zero. And on the Section 1 claim, you have perhaps what is a second-stage Twombly analysis, as explained in Iqbal. You have a set of facts which is susceptible of a perfectly neutral commercial interpretation and a set of facts which, under the appellant's view, is susceptible of interpretation as collusion. But if those are in equal poise, it just doesn't nudge the ball across the line from possible to plausible. I don't know if that answers your question. But thank you very much. Thank you. Yeah. Yeah. What can I do for you? I don't know if you've got any questions for us. Thank you very much. We're going to take a brief recess. Be back quickly.
judges: Pregerson, Reinhardt, Wardlaw